**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

SARAH ELSAYED, on behalf of herself and all others
similarly situated,

               Plaintiff,

     v.

CYBEX GMBH and COLUMBUS TRADING-
PARTNERS USA INC.,

               Defendants.

----------------------------------------------------------------X

Civil Action No: _____

**CLASS ACTION COMPLAINT**

      Plaintiff, Sarah ElSayed, on behalf of herself and all others similarly situated

("Plaintiff"), by and through her undersigned counsel, Denlea & Carton LLP, states as and for

her Complaint against defendants Cybex GmbH ("Cybex") and Columbus Trading-Partners USA

Inc. ("CTP", collectively, "Defendants"), as follows:

**NATURE OF THE ACTION**

      1.     The decision as to which infant car seat to purchase is among the first and most

important choices new parents will make.  Reasonable consumers expect that, when they

purchase a child restraint system ("CRS") designed for infants, it will keep their babies safe.[1]

Rear-facing infant car seats, which usually have a handle for carrying them and can be snapped

in and out of a base, is a type of CRS that promises safety, security and the ease of transporting a

newborn inside and outside the home, and in the car, without waking or disturbing the baby.[2]

---

[1] American Academy of Pediatrics. *Car Seats: Information for Families*.  HealthyChildren.org
(Feb. 26, 2024), https://www.healthychildren.org/English/safety-prevention/on-the-
go/Pages/Car-Safety-Seats-Information-for-Families.aspx (last accessed March 7, 2025).

[2] The American Academy of Pediatrics recommends that all infants should ride in a rear-facing
car seat until they reach the maximum height or weight allowed by the manufacturer.  *See*

Many are designed to be used as part of a "travel system" where the infant seat pairs with and snaps into a stroller. All infant CRS seats use a five-point harness system "to keep the baby safe, secure and comfortable when traveling in the vehicle."[3]

2.    Defendants design, manufacture and sell defective rear facing infant seats that do not deliver on their promise of safety and high-quality (collectively, the "Products" or the "Infant Seats.") Rather, Cybex Aton G infant seats manufactured between February 20, 2023 and May 10, 2024, contain defective harness anchor pins that can dislodge, causing the harness to detach at the hip anchor.[4] A detached harness will not only fail to restrain a baby in the event of a car crash, but exposes a baby to danger every time the seat is used at all.[5] The instruction manual for the Aton G specifically cautions parents and caregivers to "ALWAYS USE the complete and buckled five-point Harness around your child" (all caps as in original).[6]

---

Dennis R. Durbin, M.D. Benjamin D. Hoffman, M.D. et al, *Child Passenger Safety*, 142 Pediatrics, Issue 5, November 2018, https://publications.aap.org/pediatrics/article/142/5/e20182460/38530/Child-Passenger-Safety?autologincheck=redirected (last accessed March 7, 2025).

[3] Heather Corley, *Infant Car Seats vs. Convertible Car Seats,* Parents (August 7, 2024), https://www.parents.com/infant-car-seats-choosing-the-best-car-seat-8643837 (last accessed March 7, 2025).

[4] The impacted models are the Aton G rear facing infant seat (model # 522001441 and 522001443), the Aton G SensorSafe Rearfacing infant seat (model # 522001445, 522001447, 522004777, and 522004779), the Aton G Base Only model # 521004563, the Aton G Swivel Rearfacing Infant Seat (model # 522004167 and 522004169), the Aton G Swivel SensorSafe (model # 522004171, 522004173, 522005099, 522004781 and 522004783), the EOS and Aton G Travel System (model # 522003793, 522003795, 522003797, 522003799, 522003897), and the Eos and Aton G Swivel Travel System (model number 522004805 and 522005355) (the "Products").

[5] It is for this reason that the American Academy of Pediatrics advises parents or caregivers to ensure that the harness is snug, and that the chest clip sits at the center of the chest. *See* American Academy of Pediatrics. *Car Seats: Information for Families*. HealthyChildren.org (Feb. 26, 2024), https://www.healthychildren.org/English/safety-prevention/on-the-go/Pages/Car-Safety-Seats-Information-for-Families.aspx (last accessed March 7, 2025).

[6] Cybex Gold, ATON G Infant Car Seat Owner's Manual (2023), page 15, https://www.cybex-online.com/on/demandware.static/-/Sites-cybex-master-

3.      On its website, Defendants advertise the Aton G infant seat as "the ideal infant car seat solution for lightweight portability. Featuring Side-Impact Protection integrated into the shell that effectively reduces collision forces in a side-impact crash and in-shell air ventilation that keeps your child cool in warmer temps, the Aton G effectively marries the highest standards of safety with a focus on child comfort."[7]  Elsewhere, Defendants assure parents and caregivers that "Cybex aims to provide the highest level of safety for your child. Our international team of child safety experts draws on years of experience to ensure continuous progress is made. CYBEX combines contemporary design with superior safety and intelligent functionality."[8]  It offers the further reassurance that "CYBEX car seats are engineered in Germany – where safety standards are among the highest in the world."[9]

4.      Defendants make these representations because they know that parents and caregivers are willing to pay more for high-quality and safe baby products.  No reasonable consumer would purchase a premium, more expensive car seat to transport an infant that has a safety defect that could seriously harm their child.

5.      Unfortunately, all consumers who purchased the Products received a defective, unsafe and unusable infant seat that suffers from a safety defect and is subject to a major national recall.  Although the Aton G infant seat is designed to be secured in and removed from a base and to transport the baby to different locations safely and securely throughout the day, the hip

---

catalog/default/dwc36e2d45/pdfs/manuals/CS_GO_Aton_G_US/CY_171_8942_F0123_Aton_G_Infant_Car_Seat.pdf. (last accessed March 7, 2025).

[7] https://www.Cybex-online.com/en/us/p/CS_GO_Aton_G_US.html (last accessed March 7, 2025).

[8] https://www.Cybex-online.com/en/us/safety-technologies-us.html (last accessed March 7, 2025).

[9] https://www.Cybex-online.com/en/us/car-seat-testing-us.html (last accessed March 7, 2025).

anchor retention hooks under the seat are designed in a way that the anchor pins can become deformed when the seat slides or scrapes across a sharp edge such as a table, countertop or the edge of the Aton G swivel base (the "Defect").  The bending of the pins can cause the harness anchor pin to dislodge, causing the harness to detach from the seat at the hip anchor.[10]

6.     In other words, Cybex has placed the products on the market based, in part, on the promise of safety and high-quality, when the harness fails to secure infants in the seat.

7.     The Defect is confirmed by Cybex's voluntary recall of the Products on February 14, 2025 (the "Recall").  The Recall affects approximately 23,000 "Aton G," "Aton G SensorSafe," "Aton G Swivel" and "Aton G SensorSafe Swivel" rear-facing infant car seats, and travel systems sold with one of those seats.  The infant seats retail between $250 and $400 depending on the model, and the travel systems retail between $600 and $700 depending on the model.

8.     As part of the Recall, Defendants intend to begin sending notices to consumers who registered their Product on April 4, 2025, and have posted the Recall notice on the Cybex

---

[10] While Defendants claim in the Recall notice discussed *infra* that the harness anchor pin cannot dislodge when the seat is "in use" (given the tension the harness provides if affixed snugly on the baby), it seems logical that the anchor pin could also dislodge when the baby is in the infant seat if the harness is not perfectly snug (a condition which can easily occur if the infant is wearing bulkier clothing), or if the parent or caregiver opens the harness while the baby is in the seat to check a diaper, adjust clothing or tend to the baby in the myriad ways that babies require attention.  *See, e.g.,* Safe Kids Worldwide, *Ultimate Care Seat Guide,* https://ucsg.safekids.org/basic-tips/right-fit/#4 and https://ucsg.safekids.org/basic-tips/right-fit/#5 (last accessed March 7, 2025) (noting that "a loose harness is a common mistake and is not safe" and that "[w]earing bulky clothes or winter coats can prevent a snug fit of the harness").  Given that infant car seats are used throughout the day, the consequences of a harness failure can be catastrophic even without a car accident.  *See, e,g,* The Car Seat Lady, *How to Buckle Up*, https://thecarseatlady.com/buckling-up-rfo-seat/ (last accessed March 7, 2025) (noting that "Nearly 10,000 infants a year in the US suffer a head injury when they fall from or in their car seats when its used outside the car" and that, between 2004 and 2008, "31 babies died in their car seats due to asphyxiation" when harnesses were not fastened securely).

website (referencing NHTSA Notification Number 25C002). A copy of this notice is attached as Exhibit A.[11]  Because Defendants only intend to send the April 4th Recall notice to the subset of consumers who registered their purchase on the website, it is clear that most consumers have not learned about the Recall yet, and it is unclear how many consumers will actually receive notice of the Recall in April.  Given this, it is unclear whether a majority of the Product purchasers will ever learn about the Recall.

9.      In the Recall notice, Defendants acknowledge that the harness anchor pins can become deformed and dislodged, causing the harness strap to detach, and that "in the event of a vehicle crash, the detached harness would not properly restrain the occupant, increasing the occupant's risk of injury."  Defendants further state that "caregivers will notice any harness detachment when securing a child and checking harness tightness."  (Ex. A).

10.     The following illustrations of the location and nature of the Defect occur on the Cybex Recall notice (Ex. A):



---

[11] Exhibit A was downloaded from https://www.cybex-online.com/en/us/safety-notices-recalls-aton-g.html?srsltid=AfmBOooq1ie327zPBhBNXs5ElDZBocEMvwvH5y0QiWkeHAOWcP9dyfxO (last accessed March 7, 2025).





11.     The remedy Defendants offer consumers who receive notice of the Recall is entirely inadequate.   Rather than actually recalling the Product, Defendants intend to provide affected owners who have registered their car seats "with a free remedy kit on or about April 4, 2025.  This kit includes a device that locks the harness and the harness anchor pin in place, even if the harness anchor retention hook are bent, along with instructions on how to install the device."[12]   While awaiting their remedy kits, consumers are advised that they can continue to use

---

[12] The Part 573 Safety Recall Report submitted to the NHTSA states that "[t]he system consists of two interlocking components that are installed from the inside of the shell."

their car seats if they follow these steps: "Before each use, check the harness anchor retention hooks for any damage. If any hooks are bent away from the harness anchor pin, do not use the seat and contact Cybex immediately for assistance."

12.    The Recall notice further explicitly advises consumers that they should not return the infant car seat to retailers.

13.    The Recall is wholly inadequate because: i) it is not designed to reach the majority of consumers who purchased the Product; ii) the "remedy kit" is not yet available; iii) it requires consumers to perform an onerous, impracticable, time consuming and perplexing check of two small pins located on the underside of the car seat before each use until a repair is made; iv) it requires consumers to install the repair themselves, as laypersons, with no knowledge of the design of car seats and with no option to verify professionally that the repair was done correctly; v) it does not include a Recall of the entire Product (only a part, which parents and caregivers must replace themselves); and vi) it provides consumers with no monetary remedy whatsoever or opportunity to obtain replacement of the car seat (or even an opportunity for verification that they installed the repair correctly) even though they purchased a dangerous and defective Product for a premium price and even though they must purchase or find a "back up" car seat to have on hand until such time as the Defect is repaired.

14.    Defendants expressly and impliedly warrant via its owner's manual and advertisements that the car seats are fit for the ordinary purpose for which they are sold: a safe, defect-free child restraint system.

15.    Plaintiff and other class members are forced to continue using a Product that Defendants admit is unsafe and defective, to check the underside of the infant seat each time it is

---

https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25C002-6845.PDF (last accessed March 7, 2025).

used (even though a baby may be transported in the seat multiple times in a day to different locations) and to discontinue use immediately if they subjectively determine that one or both of the small hooks are bent away from the harness anchor pin or missing outright (a situation that could arise anywhere, at any time, under conditions of normal use) until such time as a repair can be made. Plaintiff and other Class Members will also be forced to purchase another infant CRS so that they have an alternative on hand if they notice a Defect, thereby incurring further damages from Defendants' misconduct.

16.     Plaintiff and Class Members relied on Defendants' misrepresentations and omissions that the Products were high-quality, safe, defect-free and fit for their intended use, and would safely transport their infants, when they purchased them.

17.     Consequently, Plaintiff and Class Members lost the entire benefit of their bargain when what they received were infant seats that are not high-quality and not safe to transport their children.

18.     Alternatively, Plaintiff and Class Members paid a price premium for the Product based upon Defendants' marketing and advertising campaign.  Given that Plaintiff and Class Members paid a premium for the Products, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

19.     Accordingly, Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350, and constitutes a breach of express and implied warranties.

20.     Plaintiff bring this action against Defendants on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

**THE PARTIES**

21.    Plaintiff Sarah ElSayed is an individual who resides in Staten Island, New York.

22.    Defendant Cybex GmbH is a limited liability company organized and existing under the laws of Germany with its principal place of business in Bayreuth, Germany.

23.    Defendant Cybex GmbH designs, manufactures, markets, and sells juvenile products, including the Products at issue.

24.    Defendant Columbus Trading-Partners USA Inc. ("CTP") is a Delaware corporation with its principal place of business in Massachusetts.

25.    Defendant CTP manufactures, markets, sells, and distributes Cybex juvenile products in the United States and New York through mass retailers in the United States and New York including, but not limited to, Bloomingdales, BuyBuy Baby, Target, Pottery Barn Kids, and Nordstrom, as well as boutique stores and other brick-and-mortar stores and websites, other online retailers such as Amazon, and Defendant's own website, and is responsible for the contents of the Cybex website and the Cybex Amazon store page in the United States.

26.    Upon information and belief, Defendant CTP is a wholly owned subsidiary and/or affiliate of Defendant Cybex

**JURISDICTION AND VENUE**

27.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (1) the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and (2) the named Plaintiff and Defendant are citizens of different states.  28 U.S.C. § 1332(d)(2)(A).

28.    The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds the requisite threshold.

29.     This Court may exercise jurisdiction over each Defendant because each has sufficient minimum contacts in New York and purposely avails itself of the markets within New York through the promotion, sale, marketing, and distribution of its products, thus rendering jurisdiction by this Court proper and necessary.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred within this judicial district and because Defendants have marketed and sold the products at issue in this action within this judicial district and have done business within this judicial district.

## CHOICE OF LAW

31.     New York law governs the state laws claim asserted herein by Plaintiff and the New York class she seeks to represent.

32.     New York has a substantial interest in protecting the rights and interests of New York residents against wrongdoing by companies that market and distribute their products within the State of New York.

## FACTUAL BACKGROUND

### I.    Cybex Markets Itself as Offering Premium Baby Products Rooted in German Engineering With a Focus on Safety

33.     Cybex is a German company that, according to its founder, Martin Pos, sought to "develop a wide range of products aimed to provide modern families with the safest and most comfortable solutions to incorporate in their lifestyle."[13]  Pos explains that "At CYBEX, we have

---

[13] Amber Rawlings, CYBEX's Urban Mobility Collection is For "Cool" Parents (and "Cool" Babies, (Dec. 5, 2024), https://hungermag.com/art-culture/cybexs-urban-mobility-collection-is-for-cool-parents-and-cool-babies (last accessed March 7, 2025).

established our own D.S.F. principle, which applies to everything we do and represents a combination of distinctive Design, highest Safety standards and smart Functionality."

34.    Consistent with this marketing vision, the Cybex website promotes Cybex products as combining safety and style, reassuring parents that its car seats conform to a "higher standard of safety" because they are "engineered in Germany- where safety standards are among the highest in the world."[14]  The website contains a link to its "Safety Center" that explores safety-related topics (including car seat testing).

35.    The Aton G infant seat, like other Cybex products, is represented on the website to contain "advanced safety features."[15] Its webpage touts that "[a]t 9 lbs, the CYBEX Aton G is the ideal infant car seat solution for lightweight portability. Focused on safety and comfort, it combines advanced technologies with luxurious details to deliver an exceptional first car seat for your child."[16]  Under "product details," its sales webpage represents that "the Aton G effectively marries the highest standards of safety with a focus on child comfort" and touts its 11-Position Adjustable, no-rethread Harness which "[e]nsures a proper fit for your child as they grow."[17]

36.    Similarly, the Aton G Swivel seat is marketed as "the first-ever rotating infant car seat with an anti-rebound bar. Offering maximum convenience and safety without compromising on design, it combines a 180-degree ergonomic swivel, advanced safety and a premium design to

---

[14] https://www.cybex-online.com/en/us/car-seat-testing-us.html  (last accessed March 7, 2025).

[15] https://www.cybex-online.com/en/us/p/ST_GO_EOS_Aton_G_TS_US.html (last accessed March 7, 2025).

[16] https://www.cybex-online.com/en/us/car-seats/infant-car-seats/ (last accessed March 7, 2025).

[17] https://www.cybex-online.com/en/us/p/CS_GO_Aton_G_US.html#:~:text=Featuring%20Side%2DImpact%20Protection%20integrated,a%20focus%20on%20child%20comfort (last accessed March 7, 2025).

deliver a best-in-class seat."[18] Like its non-swiveling counterpart, it also reassures consumers that its harness "[e]nsures a proper fit for your growing baby."

37.     These representations about quality and safety are materially important to Plaintiff, like all reasonable consumers, because child restraint systems, such as the Products at issue, are essential to protect infants and toddlers, especially in the event of a crash.

38.     With these representations, the Aton G infant seat product line commands a premium price, currently $249.95 on the website for the basic car seat alone ($399.95 for the Aton G Swivel), and $599.95 for the travel system ($699.95 for the Eos and Aton G Swivel Travel System).

39.     The instruction manual that comes with the Aton G infant seats contains many warnings and admonitions for its proper use.  Among others are: "NEVER USE CHILD RESTRAINT IF IT HAS DAMAGED, BROKEN, OR MISSING PARTS," "DO NOT attempt to make repairs to or otherwise modify or tamper with this Child Restraint" and "ALWAYS USE the complete and buckled five-point Harness around your child" (all caps as in original).[19]

40.     The Product also comes with a two-year limited warranty by which "CYBEX warrants to the original consumer purchaser that this product will be free from defects in material and workmanship for two (2) years from the date of original purchase (the "Warranty Period").

---

[18] https://www.cybex-online.com/en/us/p/CS_GO_Aton_G_Swivel_US.html (last accessed March 7, 2025).

[19] Cybex Gold, ATON G Infant Car Seat Owner's Manual (2023), pages 13, 15, https://www.cybex-online.com/on/demandware.static/-/Sites-cybex-master-catalog/default/dwc36e2d45/pdfs/manuals/CS_GO_Aton_G_US/CY_171_8942_F0123_Aton_G_Infant_Car_Seat.pdf. (last accessed March 7, 2025).

During the Warranty Period, CYBEX, at its option, may repair or replace this product if it is found by the manufacturer to be defective in material or workmanship."[20]

## II.    The Product Contains a Dangerous Defect

41.    On February 14, 2025, Defendants initiated a voluntary recall of Aton G infant car seats manufactured between February 20, 2023 and May 10, 2024. The Recall notice states that "CYBEX and Columbus Trading-Partners USA Inc., the U.S. distributor for CYBEX ... have determined that a defect which relates to product safety exists in certain Aton G and Aton G Swivel child restraint systems and associated travel systems." (Ex. A).

42.    The Recall notice further states that "CYBEX has identified that certain actions can allow the harness anchor pin to dislodge ... when the seat is not in use.  If the seat is slid or scraped over a sharp edge (like the edge of a table or countertop or possibly the edge of the Aton G Swivel Base), the harness anchorage hooks can bend.  This bending can cause the harness anchor pin to dislodge when the seat is not in use."  The Recall notice further states that "if the harness anchor pin is missing, the harness will detach from the seat at the hip anchor.  In the event of a vehicle crash, the detached harness would not properly restrain the occupant, increasing the occupants risk of injury." (Ex. A).

43.    Although the Recall notice states that "caregiver will notice any harness detachment when securing a child and checking harness tightness," it nonetheless advises parents and caregiver, before each use, to "check the harness anchor retention hooks for any damage. If any hooks are bent away from the harness anchor pin, do not use the seat and contact Cybex immediately for assistance." (Ex. A).

---

[20] *Id.,* pages 74-75.

44.    The illustration of the Defect contained in the Recall notice demonstrates how difficult it is to detect with the naked eye and how it renders the Aton G infant seat unsafe and worthless.  Especially given that most parents and other caregivers of infants transport their infants in a rear-facing seat throughout the day, it is impracticable and unreasonable to expect them to visually inspect a tiny portion of the underside of the seat before each use and make a subjective determination if a pin is bent or deformed in any way such that they should abandon further use of the seat at a moment's notice and use a substitute child restraint system.



45.    The Products thus fail their core mission as child restraint systems.  The Defect renders the Products unsafe and unsuitable for their intended purpose, and increase the risk of injury to infants in the event of a crash.  Moreover, given the intended flexible functionality of the Aton G infant seat, which is designed to be removed from its base in the car so that the infant can be carried to the house, pushed in a stroller or taken wherever the parent or caregiver wants to go secured inside it, the Defect increases the risk of injury if the harness fails at any time because the infant may fall out if the seat tips over or the infant may asphyxiate.

46.    Defendants claim to have corrected the Defect with a design change for Aton G infant seats manufactured after May 10, 2024, that removed the anchor hooks and replaced them

with a single stronger retention bar which is rounded, sits below the edges of the shell of the infant seat, and is in reversed orientation from the hooks.[21]

### III. Defendants' Recall of the Products and the Remedy Offered Under the Warranty are Wholly Inadequate

46.     Defendants' Recall is poorly designed, ineffective and inadequate for providing consumers with a meaningful remedy for purchasing the defective Product.  As of the date of the filing of this Complaint, the Recall is only posted on the Cybex website, and will not be sent to consumers who registered their products until April 4th.  Those who did not register their Products may never learn of the recall.  The Recall is not designed to reach the majority of consumers who purchased the Product.

47.     The remedy Defendants offer consumers who receive notice of the Recall is entirely inadequate.  Rather than actually recalling the Product, Defendants intend to provide affected owners who have registered their car seats (and others who happen to learn about the recall and affirmatively contact it) "with a free remedy kit on or about April 4, 2025.  This kit includes a device that locks the harness and the harness anchor pin in place, even if the harness anchor retention hook are bent, along with instructions on how to install the device." (Ex. A).

48.     The Recall puts the burden on already over-burdened parents and caregivers to repair a critical component of the five-point harness system, the entire purpose of which is to keep the infant safe and secure.  Parents and caregivers are laypeople without any special training or knowledge of care seat design which is why the instruction manual contains the instruction "DO NOT attempt to make repairs to or otherwise modify or tamper with this Child Restraint."  Defendants shirk their responsibility to provide consumers with a safe and

---

[21] Part 573 Safety Recall Report (Feb. 14, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25C002-6845.PDF (last accessed March 7, 2025).

functioning harness system by shifting this burden to them. Defendants are not even providing a method by which consumers can check that the repair is installed correctly.

49.     The Recall is also inadequate because the repair kits are not even available yet, and parents and caregivers have been directed to continue using the Product after conducting an inspection of the harness anchor retention hooks prior to each use, but to discontinue use immediately if they notice any deformation. Even if a parent or caregiver felt qualified to conduct such inspections, and conducted them religiously each time he or she took the infant in and out of the car seat, these instructions require the parent or caregiver to have a back-up car seat on hand if a deformity or a missing pin is discovered.

50.     In addition, the Recall is inadequate because it explicitly advises consumers that they should not return the infant car seat to retailers.

51.     Finally, the Recall is inadequate because it provides consumers with no monetary remedy whatsoever or opportunity to obtain replacement of the car seat even though they purchased a dangerous and defective Product for a premium price and even though many parents and caregivers will have to purchase a backup car seat so that they have a replacement on hand if they notice a bent or deformed anchor pin before receiving a repair kit.

52.     Upon information and belief, for Products that are still under the two-year warranty, Defendants will replace the car seat only if the pins are currently bent or missing. Otherwise, Plaintiff and other consumers still under warranty are only eligible to receive a repair kit under the Recall. Because it is unreasonable for Defendants to require consumers to conduct such inspection and because the repair kit is an inadequate remedy for all the reasons stated above, Defendants are unable to fulfill their warranty obligations at the point of purchase, or anytime thereafter, and the warranty is therefore breached immediately upon purchase.

53.     Defendants' false and misleading marketing of these dangerous Products, and their knowing failure to disclose the grave risks of allowing infants to continue to use these Products, allowed Defendants to reap profits at the expense of ordinary consumers who paid for premium high-quality and safe child restraint systems and believed their infants would be safe in Defendants' Products.

54.     Every Product suffers from the uniform Defect which, unknown to consumers, but known to Defendants, exists at the point of purchase and poses an unreasonable safety hazard to children. As such, Plaintiff and all reasonable consumers are victims of the unfair bargaining power between them and Defendants based on Defendants' superior industry knowledge.

55.     Defendants' misrepresentations and omissions were material and intentional because parents and caregivers are concerned about their children's safety and reasonably expect that a product designed and marketed as a high-quality child restraint system for infants will keep their infants safe and will be defect-free.  Consumers such as Plaintiff and the Class Members are influenced by the marketing and advertising campaigns for the Product.

56.     Defendants' deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

57.     Defendants' false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

58.     In making the false, misleading, and deceptive representations and omissions described herein, Defendants knew and intended that consumers would pay a premium for a Product marketed as being a high quality and safe child restraint system.

59.     Consumers such as Plaintiff and Class Members purchased and continued to purchase the Product in part because the Product is advertised as a high quality and safe product. Plaintiff and Class Members would have paid less for the Product, or they would not have purchased them at all, but for the misrepresentation that the Product is high-quality, safe, defect-free and fit for its intended use. Therefore, Plaintiff and Class Members have suffered a financial injury in the form of paying a price premium that the Product commands in the market as a result of Defendants' representation that the Product is high-quality, safe, defect-free and fit for its intended use.

60.     In addition, Defendants breached the product warranty when they shipped the Aton G car seats at issue (and at the point of sale to consumers) because the car seats were defective when they came off of the assembly line. The Defect makes consumers unable to use the car seats properly or safely.

**IV.     Plaintiff Purchased the Product Relying on Defendants' Representations that the Product was safe**

61.     In March of 2024, when Ms. ElSayed was expecting her first child, she purchased a Cybex EOS 5-in-1 travel system stroller plus lightweight Atom G infant seat (model # 522003793) for $555.18 online from Amazon.com.  Ms. ElSayed uses the car seat every day both in and out of her car and with and without the travel system to transport her infant to various locations.

62.     Prior to purchasing her travel system, Mr. ElSayed conducted significant research into various car seat brands, including Cybex.  Among other steps, she went to Posh Baby & Teen, located in Staten Island where she tried out the travel system in person and spoke to a salesperson, went on the Cybex website where she watched tutorials and read safety and other product information, read reviews and spoke with other parents.

63.     Through this process, Ms. ElSayed read and relied on Defendants' advertising and marketing materials, including its representation that the Product was known for its safety, security and high quality.

64.     Ms. ElSayed was not aware that the Product contained a Defect, or the truth (or lack thereof) of Defendants' representations that the Product was safe, defect-free and fit for its intended use, until after Defendants published their Recall notice.  Even then, she did not receive any formal notice, but only happened to learn about it.

65.     Had Ms. ElSayed understood the true nature of the Product at the time of purchase, or had Ms. ElSayed known about the truth underneath Defendants' misleading representations or had Ms. ElSayed known that Defendants would expect her to repair a Defect in the infant seat on her own, she never would have purchased the Product, or would have paid substantially less for it.

66.     The remedy offered to Ms. ElSayed through the Recall  - that is, providing a repair kit – is entirely inadequate.  Even if the repair kit was currently available (which it is not) or the repair actually remedied the Defect (currently unknown since it is not yet available), Ms. ElSayed does not feel confident "fixing" the car seat on her own, especially with no verification from an expert that the fix was installed correctly, and that the car seat is safe to use.  Nor does the repair kit remedy the false misrepresentations and omissions Defendants have made regarding the Product.  It does not make Ms. ElSayed whole.

67.     In addition, it is neither reasonable nor practicable for Ms. ElSayed to check the underside of the car seat before each use to ascertain whether the pins are bent, broken or missing until such time as the Defect is repaired.

68.    Finally, even though Ms. ElSayed's Aton G infant seat is still covered by the two-year warranty, she is not eligible receive a replacement of her infant seat because it does not appear to her that the anchor hooks are currently bent or missing.

69.    The only appropriate remedy for Ms. ElSayed is a refund for the Product.

## CLASS DEFINITION AND ALLEGATIONS

70.    Plaintiff brings this action on behalf of herself and all other similarly situated consumers in the State of New York pursuant to CPLR Section 901, and seeks certification of the following class (the "Class"):

> All consumers who, within the applicable statute of limitations period, purchased a Cybex Aton G rear facing infant seat, Aton G SensorSafe Rearfacing infant seat, Aton G Swivel infant seat, or Aton G Swivel SensorSafe Rearfacing infant seat either alone or as part of an EOS Aton G travel system, in the State of New York (whether online or in-person) manufactured, marketed, distributed, and/or sold by Defendants which Defendants warranted as being high-quality, safe, defect-free, and fit for their intended use as child restraint system (the "Class Products"). Excluded from the class are Defendants, their parents, subsidiaries, affiliates, officers and directors, judicial officers, and their immediate family members and associated court staff assigned to this case, and those who purchased Class Product for resale.

71.    Plaintiff expressly disclaims any intent to seek any recovery in this action for personal injuries that she or any Class member may have suffered.

72.    **Numerosity**.  This action is appropriately suited for a class action.  The members of the Class are so numerous that joinder of all members of the Class is impracticable.  Plaintiff is informed, believes, and thereon alleges, that the proposed Class contains thousands of purchasers of the Class Products who have been damaged by Defendants' conduct as alleged herein.  The precise number of Class members is unknown to Plaintiff.

73.    **Existence and Predominance of Common Questions of Law and Fact**.  This action involves questions of law and fact common to the Class.  The common legal and factual questions include, but are not limited to, the following:

- Whether Defendants' conduct, as alleged herein, constitutes violations of New York General Business Law Section 349**.**

- Whether Defendants' conduct, as alleged herein, constitutes violations of New York General Business Law Section 350.

- Whether Defendants labeled, packaged, advertised, marketed, and/or sold the Class Products with claims that they were high-quality, safe, defect-free, and fit for their intended use as child restraint system;

- Whether Defendants' labeling, packaging, advertising, marketing, and/or selling of the Class Products with claims that they were high-quality, safe, defect-free, and fit for their intended use as child restraint system and/or is false, fraudulent, deceptive, and/or misleading;

- Whether Defendants' manufacturing, distributing and selling of the Class Products breached their express or implied warranties.

74.    **Typicality**.  Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were subject to Defendants' misrepresentations.  Moreover, Plaintiff's claims are typical of the Class members' claims.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

75.    **Adequacy of Representation**.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff purchased a Class Product, and she was harmed by Defendants' deceptive misrepresentations.  Plaintiff has therefore suffered an injury in fact as a result of Defendants' conduct, as did all Class members who purchased Class Products. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

76.    **Superiority**.  A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her.  Further, even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

77.    Plaintiff seeks monetary damages, including statutory damages on behalf of the entire Class.  Unless a Class is certified, Defendants will be allowed to profit from their deceptive practices, while Plaintiff and the members of the Class will have suffered damages.

**As and for a First Cause of Action**
**(Violation of New York General Business Law Section 349)**

78.    Plaintiff repeats and re-alleges the allegations above as if set forth herein

79.    New York General Business Law Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in New York."

80.    By labeling, packaging, advertising, marketing, distributing, and/or selling each Class Product to Plaintiff and the other Class members with false and misleading claims that the

Class Product was high-quality, safe, defect-free, and fit for its intended use as child restraint system, Defendants engaged in, and continues to engage in, deceptive acts and practices.

81.     In taking these actions, Defendants failed to disclose material information about their products, which omissions were misleading in a material respect to consumers and resulted in the purchase of Defendants' products.

82.     Defendants have deceptively labeled, packaged, advertised, marketed, promoted, distributed, and sold the Class Products to consumers.

83.     Defendants' conduct was consumer oriented.

84.     Defendants engaged in the deceptive acts and/or practices while conducting business, trade, and/or commerce and/or furnishing a service in New York.

85.     Defendants' misrepresentations were misleading in a material respect because the Class Products are not high-quality, safe, defect-free, and fit for their intended use as a child restraint system.

86.     Defendants knew, or should have known, that by making the misrepresentations addressed herein, Plaintiff and other consumers would be misled into purchasing Class Products.

87.     Plaintiff and the Class members have been aggrieved by and have suffered losses as a result of Defendants' violations of Section 349 of the New York General Business Law.  By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce, Plaintiff and the members of the Class have been substantially injured by purchasing and/or overpaying for a product that is not what Defendants represent it to be.

88.     By reason of the foregoing, Defendants' conduct, as alleged herein, constitutes deceptive acts and practices in violation of Section 349 of the New York General Business Law, and Defendants are liable to Plaintiff and the Class for the actual damages that they have suffered

as a result of Defendants' actions, the amount of such damages to be determined at trial, plus statutory damages, treble damages, and attorneys' fees and costs.

89.    Defendants' conduct, as alleged herein, in violation of Section 349 of the New York General Business Law was engaged in by Defendants willfully and/or knowingly. Accordingly, Plaintiff and members of the Class are entitled to an award of damages above and beyond their actual damages in accordance with Section 349(h) of the New York General Business Law.

<u>As and for a Second Cause of Action</u>
**(Violation of New York General Business Law Section 350)**

90.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

91.    Defendants' labeling, packaging, marketing, and advertising of the Class Products is "misleading in a material respect," as it fails to disclose to consumers material information in Defendants' sole possession and, thus, is "false advertising."

92.    No rational individual would purchase the Class Product at the prices at which they are sold with full knowledge that the Class Product is not high-quality, safe, defect-free, and fit for its intended use as child restraint system.

93.    Defendants' labeling, packaging, marketing, and advertising of the Class Products as being safe, defect-free, and fit for their intended use as child restraint system were consumer oriented.

94.    Defendants' labeling, packaging, advertisements, and marketing of the Class Products as being high-quality, safe, defect-free, and fit for their intended use as child restraint system was misleading in a material respect, which induced Plaintiff and class members to purchase the Product.

95.    By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce in New York, Plaintiff and the members of the Class have been substantially injured by paying for a product that has diminished, lesser, or no value due to its false claims that the Class Products are high-quality, safe, defect-free, and fit for their intended use as child restraint system.

96.    Defendants' conduct, as alleged herein, constitutes false advertising in violation of Section 350 of the New York General Business Law, and Defendants are liable to Plaintiff and the members of the Class for the actual damages that they have suffered as a result of actions, the amount of such damages to be determined at trial, statutory damages, plus treble damages, and attorneys' fees and costs.

**As and for a Third Cause of Action**
(***Breach of Express Warranty***)

97.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

98.    Defendants are merchants and were at all relevant times involved in the manufacturing, distributing and/or selling of the Class Products.

99.    At all relevant times, Defendants sold the Class Products with express written warranties.

100.    According to the terms of the warranty, Defendants "warrant[] to the original consumer purchaser that this product will be free from defects in material and workmanship for two (2) years from the date of original purchase (the "Warranty Period"). During the Warranty Period, CYBEX, at its option, may repair or replace this product if it is found by the manufacturer to be defective in material or workmanship."

101.    Plaintiff brings this claim individually and on behalf of the other members of the New York Class.

102.    Pursuant to N.Y. U.C.C. Section 2-313(i)(a), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

103.    Defendants' written express warranties, as well as advertisements and media representations, formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased the Class Products.

104.    At the time of selling the Class Products, Defendants did not provide Class Products that conformed to their express warranties.

105.    Defendants breached their express warranty to repair or replace the Product because it has not repaired or replaced the Class Product and/or because it will not repair or replace the Class Product within a reasonable period.

106.    Further, Defendants have refused to provide an adequate warranty repair for the Defect, thus rendering the satisfaction of any notice requirement futile.

107.    Moreover, at the time that Defendants sold the Class Products they knew that the Class Products contained defective parts and did not conform to the warranty.  Plaintiff and other Class Members were thus induced to purchase the Class Products under false pretenses.

108.    The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Defendants have refused to provide the promised remedies within a reasonable time. Plaintiffs and other class members have suffered additional incidental and consequential damages as a result of Defendants' deceptive and fraudulent representations and their failure to provide a remedy within a reasonable time.

109.    Accordingly, recovery by Plaintiff and the other Class members is not limited to

the remedy of repair or replacement, and Plaintiff, individually and on behalf of the other Class

Members, seeks all remedies as allowed by law.

110.    As a direct and proximate result of Defendants' breach of their express warranty,

Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**As and for a Fourth Cause of Action**
***(Breach of Implied Warranty)***

111.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

112.    Defendants are merchants and were at all relevant times involved in the

manufacturing, distributing and/or selling of the Class Products.

113.    The Class Products are considered a "good" under the relevant laws.

114.    U.C.C. Section 2-314 provides that for goods to be merchantable, they must (a)

pass without objection in the trade under the contract description; (b) in the case of fungible goods,

are of fair average quality within the description; (c) are fit for the ordinary purpose for which such

goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality

and quantity within each unit and among all units involved.

115.    Defendants breached the implied warranty of merchantability because the Products

are not fit for their intended and ordinary use as child restraint system.

116.    Defendants have been provided sufficient notice of their breaches of implied

warranties associated with the Class Products. Upon information and belief, Defendants knew that

the Products are not fit for their intended use as child restraint system and were put on constructive

notice of their breach through their own testing and records.

117.    Plaintiff and each of the other Class Members were injured because the Class

Products are not fit for their intended use as child restraint system. Defendants thereby breached

N.Y. U.C.C. Law § 2-314.

118.    As a direct and proximate cause of Defendants' breach of implied warranty, Plaintiff and the other Class Members were damaged in the amount they paid for the Class Products, or in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.    Certifying this action as a class action as soon as practicable, with the Class as defined above, designating Plaintiff as the named Class representative, and designating the undersigned as Class Counsel.

B.    On Plaintiff's First Cause of Action, awarding against Defendants the damages that Plaintiff and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus statutory and treble damages.

C.    On Plaintiff's Second Cause of Action, awarding against Defendants the damages that Plaintiff and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial, plus statutory and treble damages.

D.    On Plaintiff's Third Cause of Action, awarding against Defendants the damages that Plaintiff and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial.

E.    On Plaintiff's Fourth Cause of Action, awarding against Defendants the damages that Plaintiff and the other members of the Class have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial.

F.    On Plaintiff's First, Second, Third and Fourth Causes of Action, awarding Plaintiff and the Class interest, costs, and attorneys' fees.

G.      Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:      March 10, 2025
            White Plains, New York

**DENLEA & CARTON LLP**

By:    */s/ Catherine H. Friesen_____  ___ _*
       James R. Denlea
       Jeffrey I. Carton
       Catherine H. Friesen
       2 Westchester Park Drive, Suite 410
       White Plains, New York 10604
       Tel.: (914) 331-0100
       Fax: (914) 331-0105
       jdenlea@denleacarton.com
       jcarton@denleacarton.com
       cfriesen@denleacarton.com

       *Attorneys for Plaintiff*